No. 13-1311

In the United States Court of Appeals
for the Tenth Circuit

Karen Scavetta,
        Plaintiff-Appellant,

v.

Dillon Companies, Inc. d/b/a
King Soopers, Inc.,
        Defendant-Appellee.
_____

On Appeal from the United States District Court
for the District of Colorado (1:10-cv-2986)
The Honorable William J. Martinez, Presiding
_____

**APPELLEE'S OPENING BRIEF**
_____

Raymond M. Deeny
Brooke A. Colaizzi
Sherman & Howard L.L.C.
633 Seventeenth St., Ste. 3000
Denver, CO  80202
Telephone:  303-297-2900
Facsimile:  303-298-0940
rdeeny@shermanhoward.com
bcolaizzi@shermanhoward.com

**Oral Argument Not Requested**

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Appellee Dillon Companies, Inc. d/b/a King Soopers, Inc. is a wholly owned subsidiary of The Kroger Co., which has issued shares of stock to the public.  No other publicly traded company owns more than 10% of the stock of The Kroger Co.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................i

STATEMENT OF THE CASE.................................................................................1

STATEMENT OF THE FACTS ..............................................................................2

1.   Ms. Scavetta Identified Her "Disability" as Rheumatoid Arthritis. .............2

    A.   Rheumatoid Arthritis Generally............................................................2

    B.   Ms. Scavetta's Evidence of "Substantial Limitation." ........................4

2.   King Soopers Required Its Pharmacists to Provide Immunizations.............5

3.   The Jury Instructions Gave Examples of Major Life Activities.................10

SUMMARY OF ARGUMENT ..............................................................................12

ARGUMENT ..........................................................................................................12

I.   STANDARD OF REVIEW............................................................................12

II.   THE VERDICT ON MS. SCAVETTA'S RETALIATION CLAIM
STANDS BECAUSE THE JURY DID NOT HAVE TO FIND MS.
SCAVETTA TO BE DISABLED. ..................................................................13

III.   THE JURY INSTRUCTIONS GAVE THE JURY SUFFICIENT
GUIDANCE AS TO THE GOVERNING LAW AND
ACCURATELY REFLECTED THE EVIDENCE PRESENTED AT
TRIAL...............................................................................................................13

    A.   The Jury Instruction Identified Representative Major Life Activities
and Therefore Provided Sufficient Guidance to the Jury. .................14

    B.   Ms. Scavetta Failed to Present Sufficient Evidence That the Operation
of Her Musculoskeletal or Immune  System Was Substantially
Limited. ...............................................................................................17

        1.   Even after the ADAAA, not every impairment is a
"disability" and not every impairment substantially limits
the operation of a major bodily function....................................17

        2.   Ms. Scavetta's evidence focused almost exclusively on
her ability to perform manual tasks, walk, stand, and
work.............................................................................................20

IV.   THE GOOD FAITH/UNDUE HARDSHIP INSTRUCTION IS NOT
BEFORE THIS COURT ON APPEAL. ........................................................24

STATEMENT OF RELIEF SOUGHT ..................................................................24

ADDENDUM

42 U.S.C. §12102 .................................................................................30

29 C.F.R. § 1630.2 ...............................................................................32

Excerpt from 29 C.F.R. Part 1630, Appx. .............................................40

# TABLE OF AUTHORITIES

## Cases

Achin v. Begg Tire Center, 694 F.2d 226 (10th Cir. 1982).......................................12

Angell v. Fairmount Fire Prot. Dist., 907 F. Supp. 2d 1242 (D. Colo. 2012)........................................................................................................19

Azzam v. Baptist Healthcare Affiliates, Inc., 855 F. Supp. 2d 653 (W.D. Ky. 2012)........................................................................................ 21, 22

Brownlow v. Aman, 740 F.2d 1476 (10th Cir. 1984)...............................................12

Dilley v. SuperValu, Inc., 296 F.3d 958 (10th Cir. 2002) ......................................15

Eshelman v. Agere Systems, Inc., 397 F. Supp. 2d 557 (E.D. Pa. 2005)...............23

Estate of Murray v. UHS of Fairmount, Inc., No. 10-2561, 2011 U.S. Dist. LEXIS 130199, at *24 (E.D. Pa. Nov. 10, 2011)........................18

G.T. Labs., Inc. v. Cooper Companies, Inc., No 92 C 6647, 1998 WL 704302, at *9 (N.D. Ill. Sept. 24, 1998)..................................................16

Gaylor v. Greenbriar of Dahlonega Shopping Center, Inc., No. 2:12-CV-00082-RWS, 2013 WL 5436820, at *6 (N.D. Ga. Sept. 27, 2013) ......................19

Gogos v AMS Mech. Sys., Inc., 737 F.3d 1170 (7th Cir. 2013) .............................20

Hall v. Claussen, 6 Fed. Appx. 655 (10th Cir. Mar. 6, 2001)............................ 13, 15

Horgan v. Simmons, 704 F. Supp. 2d 814 (N.D. Ill. 2010).....................................20

Kellogg v. Energy Safety Servs. Inc., 544 F.3d 1121 (10th Cir. 2008)...................15

Lederman v. Frontier Fire Prot., Inc., 685 F.3d 1151 (10th Cir. 1992)...................17

Medlock v. Ortho Biotech, Inc., 164 F.3d 545 (10th Cir. 1999) ..............................24

Meinelt v. P.F. Chang's China Bistro, Inc., 787 F. Supp. 2d 643 (S.D. Tex. 2011) .................................................................................................20

Poindexter v. Atchison, Topeka & Santa Fe Ry Co., 168 F.3d 1228 (10th Cir. 1999) ..................................................................................... 13, 14, 15

Selenke v. Medical Imaging of Colo., 248 F.3d 1249 (10th Cir. 2001)...................13

Sherouse v. Ratchner, 573 F.3d 1055 (10th Cir. 2009) ............................................12

Weber v. Strippit, Inc., 186 F.3d 907 (8th Cir. 1999)...............................................15

Whittington v. Nordam Group, Inc., 429 F.3d 986 (10th Cir. 2005) .......................12

Willoughby v. Conn. Container Corp., No. 3:11-CV-00992, 2013 WL
    6198210, at *9 (D. Conn. Nov. 27, 2013).............................................................19

**Statement of Related Cases**

None.

**Statutes**

42 U.S.C. § 12102(1) ............................................................................................17

42 U.S.C. § 12102(2) ............................................................................................18

**Regulations**

29 C.F.R. § 1630.2(j)(1)(ii).................................................................................18

29 C.F.R. § 1630.2(j)(1)(iv)................................................................................18

29 C.F.R. § 1630.2(j)(3)(iii)................................................................................19

29 C.F.R. Part 1630, Appx..................................................................................18

## STATEMENT OF THE CASE

Appellant Karen Scavetta ("Ms. Scavetta") is a former employee of Appellee Dillon Companies, Inc. d/b/a King Soopers, Inc. ("King Soopers"). King Soopers terminated Ms. Scavetta's employment on October 6, 2009 for insubordination, unsatisfactory job performance, and violation of company policies and procedures. On December 9, 2010, Ms. Scavetta sued King Soopers, alleging denial of reasonable accommodation under the Americans with Disabilities Act of 1990, as amended; age discrimination in violation of the Age Discrimination in Employment Act; retaliation under the ADA; wrongful termination in violation of Colorado public policy; and outrageous conduct. She filed an amended complaint on January 5, 2012, alleging denial of reasonable accommodation under the ADA; disparate treatment and unlawful termination under the ADA; age discrimination under the ADEA; retaliation under the ADA; wrongful termination in violation of Colorado public policy; and outrageous conduct. On January 28, 2013, the district court granted summary judgment for King Soopers on Ms. Scavetta's age discrimination and outrageous conduct claims.

Trial to a jury commenced on June 17, 2013 on Ms. Scavetta's remaining claims. During trial, Ms. Scavetta dismissed her ADA disparate treatment and unlawful termination claim and her state-law wrongful discharge claim. On June 20, 2013, the jury returned a verdict for King Soopers on Ms. Scavetta's remaining

claims, denial of reasonable accommodation and retaliation under the ADA.  The

district court entered final judgment on June 22, 2013, and this appeal followed.

## STATEMENT OF THE FACTS

### 1.     Ms. Scavetta Identified Her "Disability" as Rheumatoid Arthritis.

Ms. Scavetta worked for King Soopers in several positions from 1979 to

October 2009.  (Aplt. App. Vol. 1 at 299:15-17, 25-301:20.)  After she graduated

from pharmacy school in 1994, she became a pharmacist for King Soopers.  (Id. at

303:3-15.)  During her employment with King Soopers, Ms. Scavetta at all times

was represented by a union; as a pharmacist, she was represented by the United

Steelworkers Local 920 ("the union").  (Id. at 367:12-14; Vol. 3 at 936:15-18.)  At

all times relevant to this case, Ms. Scavetta was a "floater" pharmacist, covering

open shifts at thirteen different stores.  (Aplt. App. Vol. 1 at 338:24-25.)

### A.     Rheumatoid Arthritis Generally.

Ms. Scavetta alleges that she suffers from rheumatoid arthritis.  (Aplt. App.

Vol. 1 at 333:16-18.)  Ms. Scavetta's treating rheumatologist, Dr. Vance Bray,

testified generally about rheumatoid arthritis and its possible symptoms, treatment,

and prognoses:

> Rheumatoid arthritis is a disorder of the immune system.  So
> normally the immune system helps the body fight infections or heal
> from injuries.  But in this case, the immune system starts attacking the
> joints and other organs.  As a result of that, the joints become painful
> and swollen.  There's a potential for the joints to be permanently
> damaged causing crippling disfigurement.  Along with this, patients

2

typically have a lot of pain, stiffness, and fatigue.  There is a potential
for these patients to end up with long-term disability.  Sometimes it
will affect other parts of the body.  It can affect the lungs or heart or,
you know, other areas.  But predominantly a disease of the joints.

(Aplt. App. Vol. 2 at 603:15-604:3.)  Dr. Bray testified that he diagnoses an

individual with rheumatoid arthritis if the individual meets at least four of seven

criteria:  (1) smaller joints are affected; (2) the patient is affected on both sides of

the body; (3) the patient experiences stiffness; (4) the patient experiences swelling

in the joints; (5) the patient's blood tests positive for the disease; (6) x-rays reveal

permanent joint damage; and (7) the patient has nodules on the joints.  (Aplt. App.

Vol. 2 at 605:22-606:10.)  Thus, the specific symptoms leading to diagnosis can

vary from one patient to another.  Ms. Scavetta testified that she had swelling,

stiffness, and pain in her hands and feet, but she did not introduce evidence that she

experienced any of the other factors.  (Aplt. App. Vol. 1 at 331:6-14; 353:1-7;

416:8-10; 417:3-9; 452:14-19.)

Dr. Bray testified that for most people, rheumatoid arthritis is progressive.

(Aplt. App. Vol. 2 at 604:4-20.)  Approximately 80% of rheumatoid arthritis

patients have the disease lifelong, and 20% see the disease go away.  (Id. at 604:6-

10).  Rheumatoid arthritis patients may be more prone to infections and delayed

healing.  (Id. at 611:1-9.)  Ms. Scavetta did not present any evidence that she

herself was more prone to infections or delayed healing.

3

According to Dr. Bray, rheumatoid arthritis is "generally" episodic. (Aplt. App. Vol. 2 at 608:17-22.) However, the symptoms and treatment for an arthritis flare are highly individualized. In describing a "flare," Dr. Bray testified that a patient may experience inflammation and pain and have difficulty bending his or her fingers. (Id. at 608:23-609:9.) If a patient experiences an arthritis flare, Dr. Bray recommends that the patient listen to his or her body and, if something increases pain, avoid that activity. (Id. at 609:19-21.) Neither Dr. Bray nor Ms. Scavetta provided any specific evidence of Ms. Scavetta's triggers or symptoms during an arthritis flare.

Dr. Bray agreed that rheumatoid arthritis can affect an individual's ability to perform manual tasks, but the specific limitations vary from one individual to another because different rheumatoid arthritis patients might have different joints affected by the disease. (Aplt App. Vol. 2 at 623:6-11.) Dr. Bray believed that individuals with rheumatoid arthritis in their hands are likely to have difficulty performing manual tasks. (Id.)

B.     Ms. Scavetta's Evidence of "Substantial Limitation."

Ms. Scavetta's counsel asked her how her rheumatoid arthritis affected her life in 2008 and 2009. (Aplt. App. Vol. 1 at 334:19-20.) She responded,

> Well, I've had to give up a lot of things that I used to enjoy, I can't do anymore. I can't ride my bike. I can't golf. I can't—I have trouble walking sometimes. I have trouble lifting pots and pans to cook,

4

cleaning.  The fatigue sometimes is really bad.  So I can't do a lot of things I used to enjoy.

(Id. at 334:19-335:1.)  Ms. Scavetta also testified that her arthritis impacted her dexterity and ability to perform manual tasks, asserting that she has "trouble squeezing, gripping, grasping" and had to open prescription bottles with her palm.

(Id. at 335:2-8, 6-10.)  Ms. Scavetta specifically identified the major life activities that her arthritis impaired:

> Q.  You talked about how the rheumatoid arthritis impacted your ability too—what were some of the major life activities that it would impair?
> A.  Well, I had—gardening was one of my favorite things; riding my bike was another; tennis, I used to play tennis; golfing.  I don't do any of those anymore.
> Q.  You talked earlier also about how it impacted your ability to use pots and pans and do some of the—be able to give immunizations.  Are there any other ways how the rheumatoid arthritis would affect your life?
> A.  Oh, I was having trouble walking.
> Q.  Okay.
> A.  Walking.  My big toes hurt.
> . . .
> Q.  What about any impairment for standing?
> A.  Not—no, I had some pain, but it wasn't that bad.

(Id. at 337:11-338:2.)

## 2.    King Soopers Required Its Pharmacists to Provide Immunizations.

King Soopers has provided immunizations as a pharmacy service for many years.  (Aplt. App. Vol. 2 at 776:4-12.)  In 2006, King Soopers began a program to train all pharmacists to provide immunizations, with the goal of providing

5

immunizations to customers on a full-time, walk-in basis.  (Id. at 487:2-8; 745:15-746:1; 841:25-842:21.)  At that time, King Soopers began discussions with the union about how the company was going to implement the expansion of its immunization program.  (Id. at 745:15-746:3; 842:9-15.)  In January 2008, King Soopers notified its pharmacists that they all would be required to complete immunization training.  (Id. at 819:7-21.)  In a retail setting, only pharmacists and pharmacy interns are allowed by Colorado law to give immunizations.  (Aplt. App. Vol. 1 at 330:12-15.)  In 2007, Ms. Scavetta gave immunizations without medical restrictions.  (Id. at 331:4-8.)  She knew at the time that other pharmacists had requested exemptions from giving immunizations for medical reasons, and King Soopers' Labor Relations Department had granted those exemptions.  (Id. at 411:20-412:3; Aplt. App. Vol. 2 at 726:25-728:1; 732:10-17.)

In September 2008, Ms. Scavetta obtained a note from Dr. Bray, which stated, "Miss Scavetta may not give injections due to medical conditions and limitations."  (Aplt. App. Vol. 1 at 333:25-334:9.)  She was concerned that pain and inflammation in her thumb made it difficult for her to get the needle to retract after giving shots, and she feared contracting a blood-borne disease.  (Id. at 331:25-332:9; 334:13-20; 451:15-452:2.)  Ms. Scavetta testified, "You have to push pretty hard to get the needle to retract.  Doing the immunization isn't too hard.  It's when you get to the end to get the needle to retract, it takes quite a bit

more strength to get it to actually retract back into the syringe" (Id. at 452:8-13.)
She and Dr. Bray decided that "it would probably be best" that she not give
immunizations. (Id. at 331:13-24.)

Ms. Scavetta did not show her note to management, nor did she discuss her
desire not to give immunizations. Instead, she simply stopped giving shots and
carried the note around. (Aplt. App. Vol. 1 at 346:7-12, 19-347:3.) In September
2009, another pharmacist told her that she needed to be formally exempted from
performing immunizations by Manager of Labor Relations Stephanie Bouknight.
(Id. at 340:1-13.) Ms. Scavetta's union representative told her the same. (Id. at
342:10-342:2.) On September 4, 2009, Ms. Scavetta faxed her September 2008
note to Labor Relations. (Id. at 344:13-345:12.) After reviewing the note, Ms.
Bouknight told Ms. Scavetta's home store managers to inform her that the note
itself did not provide sufficient information, and she needed to complete King
Soopers' Sick Pay Request/Medical Disability Leave of Absence form ("the
disability form"). (Id. at 350:20-351:5; 352:14-19; Aplt. App. Vol. 4 at 1128-29.)

On September 26, 2009, Store Manager Dwayne Haynes reported to
pharmacy management and Ms. Bouknight that Ms. Scavetta was refusing to give
immunizations because she claimed that her CPR card had expired.[1] (Aplt. App.
Vol. 4 at 1127.) On September 27, 2009, Pharmacy Coordinator Jeff Meador

---

[1] The basis for Ms. Scavetta's state law wrongful discharge claim was an allegation that King Soopers was forcing
her to give immunizations without a valid CPR card, in violation of state pharmacy regulations. (Aplt. App. Vol. 1
at 42-43.) As noted above, Ms. Scavetta voluntarily dismissed this claim during trial.

observed Ms. Scavetta working in a store pharmacy with a posted sign stating that no immunizer was on duty. (Aplt. App. Vol. 2 at 913:11-914:19; Vol. 4 at 1127.) Ms. Scavetta told Mr. Meador that she had been on vacation for two weeks and had not had time to submit her doctor's note to Labor Relations for an exemption. (Aplt. App. Vol. 2 at 913:11-914:19; Vol. 4 at 1126.) Mr. Meador instructed Ms. Scavetta's store management that she was expected to give immunizations until she received an exemption, and she was not to post signs turning customers away. (Aplt. App. Vol. 4 at 1125.)

Ms. Scavetta saw Dr. Bray on Friday, October 2, 2009. (Aplt. App. Vol. 1 at 352:23-25.) Even though she had not given shots for a year, Ms. Scavetta told Dr. Bray that she could not get the needle to retract and needed the disability form filled out so she did not have to give shots. (Id. at 353:3-12.) On the disability form, Dr. Bray listed Ms. Scavetta' diagnosis as "joint pain, swelling, limited flexibility, inflammatory polyarthropathy." (Aplt. App. Vol. 4 at 1129.) Dr. Bray described Ms. Scavetta's work restriction as "may not give flu or other injections. No other restrictions at this time." (Id.) Dr. Bray did not provide any additional information, including an expected duration or specific information about the actual physical motions that Ms. Scavetta could not perform. (Id.)

Ms. Scavetta faxed the form to Labor Relations later that day. (Aplt. App. Vol. 1 at 356:14-20.) That afternoon, King Soopers informed Ms. Scavetta that

she had not yet been exempted from giving immunizations because the four-part form did not provide sufficient information for King Soopers to move forward with evaluating her request for an exemption. (Aplt. App. Vol. 2 at 762:1-763:22.) Ms. Scavetta was told that she was expected to give immunizations until she was exempted. (Id. at 916:1-4; Aplt. App. Vol. 1 at 357:14-360:6.)

Ms. Scavetta was scheduled to work the next Sunday, October 4, 2009, as the only pharmacist at Store No. 122.[2] (Aplt. App. Vol. 1 at 364:21-24.) During the day, the store made announcements over the PA system that flu shots were available in the pharmacy, and banners advertising immunizations were displayed inside and outside of the store. (Aplt. App. Vol. 2 at 435:18-22; 565:25-566:2.) Despite having been told that she was not exempted and was required to give shots, Ms. Scavetta turned customers away from the pharmacy who were seeking immunizations and posted a sign indicating that no immunizer was on duty.[3] (Id. at 434:20-25; 459:6-9; 566:3-567:3.) Ms. Scavetta did not speak with or get permission from the Store Manager to turn customers away or to post the sign. (Id. at 435:4-11; 436:10-15; 567:4-5.) When Store Manager Steve Anger instructed her to give shots to waiting customers, including four visually-impaired individuals

---

[2] Ms. Scavetta accepted this shift even though she knew she would be the only pharmacist at the store and without making any arrangements ahead of time to serve customers requesting immunizations. (Aplt. App. Vol. 1 at 436:16-437:106; Vol. 2 at 565:12-24; 754:2-10; 774:4-6; 796:5-12.)

[3] On cross-examination, Ms. Scavetta admitted that she did posted a sign on October 4, 2009. (Aplt. App. Vol. 1 at 434:23-25; 459:6-9.) When she testified again as a rebuttal witness, she denied posting any signs after the September admonishment from Mr. Meador and store management. (Aplt. App. Vol. 3 at 993:21-994:4.)

who were frequent customers of the store, Ms. Scavetta refused.[4]  (Id. at 569:4-25;

Aplt. App. Vol. 1 at 367:20-22.)  Mr. Anger suspended Ms. Scavetta pending a

meeting about her conduct.  (Aplt. App. Vol. 1 at 368:2-4; 369:8-10.)  Mr. Anger

called in another pharmacist to complete Ms. Scavetta's shift and to provide

immunizations to the waiting customers.  (Id. at 368:5-16.)

On Tuesday, October 6, 2009, Mr. Anger met with Ms. Scavetta, her union

representative Val Gheller, and witness Paula Winter in his office at Store No. 122.

(Aplt. App. Vol. 1 at 371:23-372:8, 21-373:1.)  Mr. Anger terminated Ms. Scavetta

for insubordination, unsatisfactory job performance, and violation of policies and

procedures.[5]  (Id. at 317:11-13; 373:12-16; 374:19-22.)

## 3.    __The Jury Instructions Gave Examples of Major Life Activities.__

Ms. Scavetta requested that the jury instruction defining "disability," which

included examples of "major life activities," include the operation of Ms.

Scavetta's musculoskeletal and immune systems.  (Aplt. App. Vol. 1 at 146.)  King

Soopers objected that Ms. Scavetta did not provide sufficient evidence that her

rheumatoid arthritis substantially limited the operation of those systems.  (Aplt.

App. Vol. 3 at 1118:12-20.)  The district court determined that Ms. Scavetta did

---

[4] Store 122 had frequent guests who were visually impaired because the store was located near a school for the visually-impaired.  (Aplt. App. Vol. 2 at 569:4-20.)

[5] Ms. Scavetta filed a grievance through the union with respect to her termination.  (Aplt. App. Vol. 1 at 405:7-9; 426:6-9.)  However, in December 2009 she ordered the union to withdraw her grievance and described the union's conduct with respect to her case—specifically her union representative's suggestion that her CPR issue was separate from her medical exemption issue— "offensive, irresponsive, and frankly unacceptable."  (Aplt. App. Vol. 2 at 491:10-493:24; Aplee. Supp. App. at 020-024.)

not produce sufficient evidence that her musculoskeletal and/or immune system was substantially limited and omitted them from the jury instruction. (Id. at 1117:18-1118:1.) The given instruction stated that Ms. Scavetta must prove that her impairment substantially limited a major life activity, "such as performing manual tasks, walking, standing, or working." (Aplt. App. Vol. 1 at 226.)

King Soopers proposed a Jury Interrogatory and Special Verdict Form that included the question "Did plaintiff Karen Scavetta have a 'disability?'" (Aplt. App. Vol. 1 at 100.) Ms. Scavetta refused to stipulate to the form, stating that it was "excessively lengthy" and risked confusing the jury. (Id. at 130.) Ms. Scavetta's objection stated, "Asking the jury separately about each element of each claim will risk confusing the jurors and distract them from addressing the facts before them." (Id.) Ms. Scavetta submitted a proposed verdict form that did not ask the jury to indicate whether or not it found Ms. Scavetta to be disabled. (Aplee. Supp. App. at 001-008.) The district court agreed with Ms. Scavetta and did not submit a special interrogatory to the jury as to whether or not Ms. Scavetta was "disabled." (Aplt. App. Vol. 1 at 247-49.) The district court provided the jury with a verdict form that only asked (1) did Ms. Scavetta prove that King Soopers failed to reasonably accommodate her; and (2) did Ms. Scavetta prove that King Soopers retaliated against her for engaging in protected activity. (Id. at 247-48.)

## SUMMARY OF ARGUMENT[6]

The district court did not err in declining to instruct the jury that the operation of Ms. Scavetta's musculoskeletal system and/or the operation Ms. Scavetta's immune system was a "major life activity." The verdict for King Soopers on Ms. Scavetta's retaliation claim must stand because Ms. Scavetta did not have to prove she was disabled to prevail on that claim. As to the failure to accommodate claim, no authority requires a court to include every conceivable major life activity in the jury instructions. The district court used an inclusive jury instruction that included major life activities supported by the evidence.

## ARGUMENT

## I.     STANDARD OF REVIEW.

The appellate court reviews *de novo* whether the jury instructions as a whole accurately informed the jury of the governing law and reviews *de novo* any decisions of law encompassed in the jury instructions. Sherouse v. Ratchner, 573 F.3d 1055, 1060 (10th Cir. 2009); Whittington v. Nordam Group, Inc., 429 F.3d 986, 996, 998 (10th Cir. 2005). Only when sufficient evidence supports an issue or theory is the party offering an instruction entitled to have the instruction given. Brownlow v. Aman, 740 F.2d 1476, 1498 (10th Cir. 1984) )) (citing Achin v. Begg Tire Center, 694 F.2d 226, 228 (10th Cir. 1982).

---

[6] Ms. Scavetta and the EEOC, as *amicus curiae*, essentially make the same argument with respect to the "disability" jury instruction, and therefore King Soopers' response is directed toward both Ms. Scavetta's and the EEOC's briefs.

## II.     THE VERDICT ON MS. SCAVETTA'S RETALIATION CLAIM STANDS BECAUSE THE JURY DID NOT HAVE TO FIND MS. SCAVETTA TO BE DISABLED.

The correctness of the jury instruction defining "disability" is irrelevant to the retaliation verdict.  The retaliation instruction submitted to the jury did not require the jury to find that Ms. Scavetta was disabled within the meaning of the ADA in order to find King Soopers liable for retaliation.  (Aplt. App. Vol. 1 at 223.)  This instruction is consistent with the case decisions in the Tenth Circuit holding that a plaintiff's good faith belief that the ADA was violated is sufficient to support a retaliation claim; an actual disability is not required.  See, e.g., Selenke v. Medical Imaging of Colo., 248 F.3d 1249, 1264 (10th Cir. 2001).  The jury's verdict on Ms. Scavetta's retaliation claim must stand.

## III.     THE JURY INSTRUCTIONS GAVE THE JURY SUFFICIENT GUIDANCE AS TO THE GOVERNING LAW AND ACCURATELY REFLECTED THE EVIDENCE PRESENTED AT TRIAL.

Ms. Scavetta's characterization of the jury instruction defining "disability" as "erroneous" misses the mark; the question on appeal is whether the jury instruction was incomplete in such a way that the jury had insufficient guidance as to what constituted major life activities, as identified by the evidence in the case.  See Hall v. Claussen, 6 Fed. Appx. 655, 666-67 (10th Cir. Mar. 6, 2001) (citing Poindexter v. Atchison, Topeka & Santa Fe Ry Co., 168 F.3d 1228, 1231 (10th Cir. 1999)).  The jury instruction provided sufficient guidance to the jury.

In an ADA case, the trial court must decide whether the activities that a plaintiff alleges are substantially limited are "major life activities" within the meaning of the ADA. Poindexter, 168 F.3d at 1230. In this case, the parties do not dispute that under the Americans with Disabilities Act Amendments Act of 2008 (ADAAA), "major life activity" includes "the operation of a major bodily function." Rather, the issue is whether the district court was required to include the operation of Ms. Scavetta's musculoskeletal and/or immune system in the examples provided to the jury. It was not so required.

A.      The Jury Instruction Identified Representative Major Life Activities and Therefore Provided Sufficient Guidance to the Jury.

The trial court is required to provide a representative list of the relevant major life activities to the jury, not an exhaustive one. In Poindexter, the plaintiff sued for disability discrimination based upon a panic disorder after her employer denied a transfer request. 168 F.3d at 1230. The jury returned a verdict for the plaintiff, but the Tenth Circuit reversed because the district court submitted the issue of affected major life activities to the jury. Id. at 1231. Specifically, "[T]he court neither found nor precisely articulated an impairment and major life activity that the impairment may have affected." Id. As such, "[t]he jury had no guidance as to which endeavors it could properly consider as major life activities in reaching its decision." Id. The Tenth Circuit's concern was that it had "no way of knowing whether the jury verdict rested on a proper major life activity." Id. at n.1.

14

The concern in Poindexter was that the jury might have identified something as a "major life activity" that was not, in fact, a major life activity.  See also Kellogg v. Energy Safety Servs. Inc., 544 F.3d 1121, 1126 (10th Cir. 2008) (setting aside jury verdict because jury was erroneously instructed that driving is a major life activity).  That concern is not at play here, as the district court identified and included in the jury instruction examples of major life activities that were supported by evidence in the record.[7]

In the wake of Poindexter,  courts have found jury instructions sufficient if they provide examples of major life activities, even if those examples are not exhaustive.  See Hall v. Claussen, 6 Fed. Appx. 655, 667 (10th Cir. Mar. 6, 2001) (jury instruction was sufficient when it provided specific examples of major life activities and plaintiff offered evidence at trial that his impairment substantially limited one of the major life activities listed); Dilley v. SuperValu, Inc., 296 F.3d 958, 965 (10th Cir. 2002) (no plain error when district court provided an instruction with several examples of major life activities but declined to instruct the jury to consider only the major life activities listed); Weber v. Strippit, Inc., 186 F.3d 907, 915 (8th Cir. 1999) (rejecting plaintiff's argument that a jury instruction improperly

---

[7] Ms. Scavetta specifically objected to King Soopers' proposed verdict form, which would have required the jury to indicate whether or not it found Ms. Scavetta to be "disabled."  (Aplee. Supp. App. at 009-012.)  Ms. Scavetta cannot now argue that the verdicts should be reversed because we do not know what the jury concluded about whether or not Ms. Scavetta was disabled.

emphasized the major life activity of working when the instruction included several examples and did not require the jury to consider only working).

The phrasing of the jury instruction that was given in this case is inclusive, not exclusive.  The instruction states, "Ms. Scavetta has a disability if she has a physical impairment that substantially limits one or more of her major life activities, <u>such as</u>, performing manual tasks, walking, standing, or working." (Aplt. App. Vol. 1 at 226, emphasis added.)  The phrase "such as" means that the following items are representative, not exclusive.  <u>See</u> <u>G.T. Labs., Inc. v. Cooper Companies, Inc.</u>, No 92 C 6647, 1998 WL 704302, at *9 (N.D. Ill. Sept. 24, 1998) (unpublished) (in analyzing jury instruction, "[t]he use of the phrases 'like' and 'such as' and 'generally' confirms that the items listed are examples and does not suggest that they are exclusive.")  The approved jury instruction actually does <u>not</u> reflect the district court's ruling that the only major life activities supported by the evidence are performing manual tasks, walking, standing and working, and therefore does not create the prejudice that Ms. Scavetta alleges.  Moreover, based on the quantity and specificity of the evidence related to the listed major life activities compared to the dearth of evidence related to impairment of bodily functions, see III.B., <u>infra</u>, no reasonable jury could conclude that Ms. Scavetta was substantially limited as to a major bodily function but not substantially limited as to the listed major life activities.  Therefore, the phrasing of the jury instruction

16

does not constitute reversible error because the jury could not have reasonably based its verdict on the alleged omission of major bodily functions.  See Lederman v. Frontier Fire Prot., Inc., 685 F.3d 1151, 1154 (10th Cir. 1992) (judgment must be reversed if the jury might have based its verdict on the erroneously given instruction).[8]

B.    Ms. Scavetta Failed to Present Sufficient Evidence That the Operation of Her Musculoskeletal or Immune  System Was Substantially Limited.

Regardless of the lack of error in the jury instruction, Ms. Scavetta did not provide sufficient evidence that her rheumatoid arthritis substantially limited her musculoskeletal or immune system.  Therefore, the district court did not err in declining to include the operation of those systems as a "major life activity" in the jury instructions.

1.    *Even after the ADAAA, not every impairment is a "disability" and not every disability substantially limits the operation of a major bodily function.*

Under the Americans with Disabilities Act, a "disability" is defined as a physical or mental impairment that substantially limits one or more major life activities of the individual.  42 U.S.C. § 12102(1)(A).  Even under the expansive standards imposed by the Americans with Disabilities Act Amendments Act of

---

[8] Ms. Scavetta seems to characterize the disputed jury instruction as one outlining "burdens of proof."  (See Appellant's Opening Brief at p. 17.)  The issue on appeal is solely whether the district court improperly declined to specifically identify two major life activities.  This disputed jury instruction does not relate to the burdens of proof in this case.

2008 (ADAAA), "not every impairment will constitute a disability . . . ." 29

C.F.R. § 1630.2(j)(1)(ii).  In other words, not every impairment will substantially

limit one or more major life activities.  Indeed, the ADAAA regulations confirm

that "the determination of whether an impairment substantially limits a major life

activity *requires an individualized assessment.*"  29 C.F.R. § 1630.2(j)(1)(iv)

(emphasis added).  Because of this dictate, as one court noted, "the line must be

drawn somewhere" as to when an individual is, and is not, disabled.  Estate of

Murray v. UHS of Fairmount, Inc., No. 10-2561, 2011 U.S. Dist. LEXIS 130199,

at *24 (E.D. Pa. Nov. 10, 2011) (unpublished).

The ADAAA added "operation of a major bodily function" to the litany of

major life activities to which we had become accustomed.  42 U.S.C. §

12102(2)(B).  "Major bodily functions" include the function of the immune

system, normal cell growth, digestive, bowel, bladder, neurological, brain,

respiratory, circulatory, endocrine, and reproductive functions.  Id.  In explanation,

the EEOC states in rather circular fashion that "impairments, by definition, affect

the functioning of bodily systems," and therefore "generally affect major bodily

functions."  29 C.F.R. Part 1630, Appx., Section 1630.2(i).  As an example, the

EEOC noted that "rheumatoid arthritis affects musculoskeletal functions."  Id.

An "affected" major bodily function is not automatically a "substantially

limited" major bodily function, just as not every impairment is a disability.  The

18

regulations identify disabilities that the EEOC believed will almost always

substantially limit major life activities.  See 29 C.F.R. § 1630.2(j)(3)(iii).

Specifically, the EEOC identified the following:

> Deafness, blindness, intellectual disability, partially or completely missing limbs, mobility impairments requiring wheelchair, autism, cancer, cerebral palsy, diabetes, epilepsy, HIV, multiple sclerosis, muscular dystrophy, major depressive disorder, bipolar disorder, post-traumatic stress disorder, obsessive-compulsive disorder, and schizophrenia.

29 C.F.R. § 1630.2(j)(3)(iii); see also Angell v. Fairmount Fire Prot. Dist., 907 F.

Supp. 2d 1242, 1250 (D. Colo. 2012) (concluding that cancer was a disability

within the meaning of the ADAAA because the regulations stated that cancer

substantially limited the operation of a major bodily function, specifically normal

cell growth); Gaylor v. Greenbriar of Dahlonega Shopping Center, Inc., No. 2:12-

CV-00082-RWS, 2013 WL 5436820, at *6 (N.D. Ga. Sept. 27, 2013)

(unpublished) (in determining whether plaintiff was "disabled," citing to

regulations that multiple sclerosis, "at a minimum, . . . 'substantially limits

neurological function'"); Willoughby v. Conn. Container Corp., No. 3:11-CV-

00992, 2013 WL 6198210, at *9 (D. Conn. Nov. 27, 2013) (unpublished) (finding

diabetes to be a "disability," relying on regulations' statement that "diabetes

substantially limits endocrine function").  So, although the EEOC identifies

rheumatoid arthritis as an impairment that affects a major bodily function, it does

not identify it as an impairment that will almost always substantially limit any

particular major life activity, including the operation of any specific major bodily function.  Because the EEOC retained, post-ADAAA, its guidance that the determination of whether or not an employee is disabled requires an individualized assessment, it follows that the district court was obligated to determine whether Ms. Scavetta submitted sufficient evidence that <u>her</u> rheumatoid arthritis substantially limited the operation of <u>her</u> musculoskeletal and/or immune systems.[9] She failed to do so.

> 2.    *Ms. Scavetta's evidence focused almost exclusively on her ability to perform manual tasks, walk, stand, and work.*

The district court did not err in concluding that Ms. Scavetta did not provide sufficient evidence that her rheumatoid arthritis substantially limited the operation of her immune or musculoskeletal systems.  The district court limited major life

---

[9] Neither Ms. Scavetta nor the EEOC provides any case law to the contrary.  Ms. Scavetta did not cite any law at all related to this issue.  The EEOC's cases are clearly distinguishable.  The issue in <u>Gogos v AMS Mech. Sys., Inc.</u>, 737 F.3d 1170 (7th Cir. 2013)  was whether the district court properly dismissed the plaintiff's complaint. 737 F.3d at 1171.  The Seventh Circuit held that the plaintiff's allegations that his very high blood pressure and intermittent blindness substantially limited his circulatory function and eyesight "alleged sufficient facts plausibly showing that he is disabled." <u>Id.</u> at 1172.  The Court did not consider whether the evidence actually proved disability.  The other two cases that the EEOC cites involved a brain tumor and HIV, both of which the EEOC identified as impairments that will almost always constitute disabilities.  <u>See</u> <u>Meinelt v. P.F. Chang's China Bistro, Inc.</u>, 787 F. Supp. 2d 643, 651 (S.D. Tex. 2011) (brain tumor); <u>Horgan v. Simmons</u>, 704 F. Supp. 2d 814 (N.D. Ill. 2010) (HIV-positive status); 29 C.F.R. § 1630.2(j)(3)(iii) (including cancer and HIV in the list of impairments that will almost always substantially limit major life activities).  As explained in more detail above, the EEOC apparently did not consider rheumatoid arthritis to be such a disability.

The EEOC essentially argues in its *amicus* brief that any "restriction" or "effect" on a major bodily function is sufficient evidence of substantial limitation for the jury to find a disability.  (<u>See</u> EEOC Brief as Amicus Curiae Supporting Appellant, Doc. 01019186002 at 2-3.)  Such a conclusion cannot be squared with either the EEOC's explicit statement that "disability" still requires an individualized assessment or its decision to identify a rather limited number of impairments as ones that will almost always result in substantial limitation of some major life activity.  As the regulations themselves note, almost every impairment will affect a major bodily function.  29 C.F.R. Part 1630, Appx.

The EEOC's supplemental authority adds nothing to discussion.  (<u>See</u> Doc. #01019193252.)  The cited material does not address the issue in this case—the lack of evidence to support Ms. Scavetta's request for an expanded list of major life activities.

activities identified in the jury instructions to those that the court "believed there was some evidence of . . . ." (Aplt. App. Vol. 3 at 1117:18-1118:4.)  The district court was not obligated to identify to the jury specific major life activities for which Ms. Scavetta failed to produce sufficient evidence of substantial impairment.  See Azzam v. Baptist Healthcare Affiliates, Inc., 855 F. Supp. 2d 653 (W.D. Ky. 2012).

In Azzam, the court considered the employer's motion for summary judgment against plaintiff Azzam's claims of disability discrimination and failure to accommodate.  855 F. Supp. 2d at 657.   The plaintiff was hired as a registered nurse.  Id. at 655.  She requested leaves of absence, schedule changes, and other accommodations related to cardiac and neurological problems, including stroke symptoms.  Id. at 655-56.  After a significant period of time during which Azzam could not work a full schedule or perform full duties and refused to try, her employment was terminated.  Id. at 656.  Azzam then sued.  Id. at 657.

The district court first considered whether Azzam was disabled within the meaning of the ADA and ADAAA.  Azzam, 855 F. Supp. 2d at 658.  The court easily concluded that Azzam's stroke-like symptoms constituted an impairment. Id.  However, the court rejected Azzam's assertion that her impairment substantially limited her neurological function.  Id. at 659.  Although the court recognized the fact that the ADAAA broadened protections for individuals, it

concluded that Azzam offered "no evidence" to support her claim that her impairment substantially limited her neurological functions.  Id.

As Azzam illustrates, the mere fact that rheumatoid arthritis is a disease of the musculoskeletal system and/or of the immune system is not enough to support Ms. Scavetta's argument that the operation of those systems should have been included as major life activities in the jury instructions.  Dr. Bray testified generally about the potential impacts of rheumatoid arthritis on an individual's bodily systems, but he also emphasized that its specific impact on specific individuals varied.  He did not testify about any systemic limitations specific to Ms. Scavetta.  Ms. Scavetta did not introduce evidence that her bodily systems were limited in the manner described by Dr. Bray.  Ms. Scavetta did not provide any evidence that she had difficulty fighting illness or healing from injury as a result of her arthritis.  She did not introduce any evidence of permanent joint damage or disfigurement.[10]

Rather, Ms. Scavetta's and Dr. Bray's testimony focused on her arthritis' impact on her ability to perform manual tasks, walking, standing, or working.  Dr. Bray testified that Ms. Scavetta had difficulty using a manual stapler, opening jars and bottles, gardening, holding a coffee pot and cup, and giving immunizations.  (Aplt. App. Vol. 2 at 376:12-377:1, 17-23; 391:25-392:13.)  Ms. Scavetta testified

---

[10] In fact, Dr. Bray testified about an x-ray exam of Ms. Scavetta's hands, about which he commented that her MCP joints were "unremarkable."  Dr. Bray clarified that despite the pain and swelling that Ms. Scavetta had reported in those joints, the x-ray showed no signs of permanent damage.  (Aplt. App. Vol. 2 at 656:13-657:5.)

that she had "manual dexterity problems." (Aplt. App. Vol. 1 at 164:3-12.) She had difficulty gardening, biking, playing tennis, golfing, holding pots and pans, and giving immunizations." (Id. at 84:11-85:8.) She had trouble walking and used a stool because she had difficulty standing. (Id. at 165:11-19.) When Ms. Scavetta's counsel specifically asked her about the major life activities affected by her arthritis, Ms. Scavetta listed gardening, riding her bike, tennis, golf, using pots and pans, and walking. (Id. at 337:11-338:2.) Despite her assertion that she had to use a stool because standing was difficult, she rejected her counsel's suggestion that her standing was impaired. (Id.)

In her Opening Brief, Ms. Scavetta did not provide any legal authority supporting her argument that the court erred in failing to include the operation of major bodily functions in the jury instructions. The court properly limited the jury instruction to the major life activities supported by sufficient evidence of substantial limitation. See Eshelman v. Agere Systems, Inc., 397 F. Supp. 2d 557, 574-75 (E.D. Pa. 2005) (in consideration of post-trial motions, holding that district court properly instructed the jury on the two major life activities "relevant" to the case; it was not error to decline to instruct the jury that driving and commuting were not major life activities). The jury's verdict must stand.

## IV.    THE GOOD FAITH/UNDUE HARDSHIP INSTRUCTION IS NOT BEFORE THIS COURT ON APPEAL.

Ms. Scavetta did not object to or appeal any issues related to the good faith/undue hardship instruction discussed in the EEOC's *amicus curiae* brief, and therefore the Court need not and should not consider the instruction on appeal.  See Medlock v. Ortho Biotech, Inc., 164 F.3d 545, 553 (10th Cir. 1999) (describing a party's burden to show fundamental injustice when it assigns error to giving or failing to give a jury instruction when the party did not object at trial).  Moreover, the instruction given by the district court (Aplt. App. Vol. 1 at 89) was a stock instruction, and the EEOC does not cite to a single case that supports its assertion that the jury instruction was plain error.

## STATEMENT OF RELIEF SOUGHT

King Soopers respectfully requests that this Court affirm the judgment entered by the district court .

Respectfully submitted this 10th day of February, 2014.

s/ Brooke A. Colaizzi
Raymond M. Deeny
Brooke A. Colaizzi
Sherman & Howard L.L.C.
633 17th St., Suite 3000
Denver, CO  80202
Tel:  303-297-2900 / Fax:  303-298-0940
Email:  rdeeny@shermanhoward.com
          bcolaizzi@shermanhoward.com

Attorneys for Appellee

24

**CERTIFICATE OF DIGITAL SUBMISSION AND PRIVACY REDACTIONS**

I hereby certify that a copy of the foregoing APPELLEE'S OPENING BRIEF, as submitted in digital form via the court's ECF system, is an exact copy of the written document filed with the Clerk and has been scanned for viruses with System Center Endpoint Protection and, according to the program, is free of viruses. In addition, I certify that all required privacy redactions have been made.

By: s/ Brooke A. Colaizzi

Brooke A. Colaizzi

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing APPELLEE'S OPENING BRIEF was furnished through electronic service (ECF) to the following:

Marc L. Schatten
Schatten Law Firm
1439 Court Place
Denver, CO 80202
mls@denverlawfirm.com

Paul D. Ramshaw
U.S. Equal Employment Opportunity Commission
131 M St., NE
Washington, DC 20507
paul.ramshaw@eeoc.gov

s/ Clarine R. Kuntz

**ADDENDUM**

## 42 USCS § 12102

Current through PL 113-74, with a gap of PL 113-73, approved 1/16/2014

### United States Code Service - Titles 1 through 51  >  TITLE 42.  >  CHAPTER 126.

---

§ 12102. Definition of disability

---

As used in this Act:

   (1) Disability. The term "disability" means, with respect to an individual--

      (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

      (B) a record of such an impairment; or

      (C) being regarded as having such an impairment (as described in paragraph (3)).

   (2) Major life activities.

      (A) In general. For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.

      (B) Major bodily functions. For purposes of paragraph (1), a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

   (3) Regarded as having such an impairment. For purposes of paragraph (1)(C):

      (A) An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

      (B) Paragraph (1)(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less.

   (4) Rules of construction regarding the definition of disability. The definition of "disability" in paragraph (1) shall be construed in accordance with the following:

      (A) The definition of disability in this Act shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act.

      (B) The term "substantially limits" shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008.

      (C) An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability.

      (D) An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

42 USCS § 12102

**(E)** (i) The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as--

**(I)** medication, medical supplies, equipment, or appliances, low-vision devices (which do not include ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aids and cochlear implants or other implantable hearing devices, mobility devices, or oxygen therapy equipment and supplies;

**(II)** use of assistive technology;

**(III)** reasonable accommodations or auxiliary aids or services; or

**(IV)** learned behavioral or adaptive neurological modifications.

**(ii)** The ameliorative effects of the mitigating measures of ordinary eyeglasses or contact lenses shall be considered in determining whether an impairment substantially limits a major life activity.

**(iii)** As used in this subparagraph--

**(I)** the term "ordinary eyeglasses or contact lenses" means lenses that are intended to fully correct visual acuity or eliminate refractive error; and

**(II)** the term "low-vision devices" means devices that magnify, enhance, or otherwise augment a visual image.

---

**History**

---

(July 26, 1990,P.L. 101-336, § 3, 104 Stat. 329; Sept. 25, 2008, *P.L. 110-325, § 4(a), 122 Stat. 3555.)*

*UNITED STATES CODE SERVICE*

*Copyright © 2014 Matthew Bender & Company, Inc. a member of the LexisNexis Group ™ All rights reserved.*

**29 CFR 1630.2**

This section is current through the January 30, 2014 issue of the Federal Register

**Code of Federal Regulations** > **TITLE 29--** > **SUBTITLE B--** > **CHAPTER XIV--** > **PART 1630--**

---

§ 1630.2 Definitions.

(a)  Commission means the Equal Employment Opportunity Commission established by section 705 of the Civil Rights Act of 1964 *(42 U.S.C. 2000e-4).*

(b)  Covered Entity means an employer, employment agency, labor organization, or joint labor management committee.

(c)  Person, labor organization, employment agency, commerce and industry affecting commerce shall have the same meaning given those terms in section 701 of the Civil Rights Act of 1964 *(42 U.S.C. 2000e).*

(d)  State means each of the several States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the Virgin Islands, the Trust Territory of the Pacific Islands, and the Commonwealth of the Northern Mariana Islands.

(e)  **Employer --**

  (1)  In general. The term employer means a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person, except that, from July 26, 1992 through July 25, 1994, an employer means a person engaged in an industry affecting commerce who has 25 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding year and any agent of such person.

  (2)  Exceptions. The term employer does not include --

    (i)  The United States, a corporation wholly owned by the government of the United States, or an Indian tribe; or

    (ii)  A bona fide private membership club (other than a labor organization) that is exempt from taxation under *section 501(c) of the Internal Revenue Code of 1986.*

(f)  Employee means an individual employed by an employer.

(g)  Definition of "disability."

  (1)  In general. Disability means, with respect to an individual--

    (i)  A physical or mental impairment that substantially limits one or more of the major life activities of such individual;

    (ii)  A record of such an impairment; or

    (iii)  Being regarded as having such an impairment as described in paragraph (l) of this section . This means that the individual has been subjected to an action prohibited by the ADA as amended because of an actual or perceived impairment that is not both "transitory and minor."

  (2)  An individual may establish coverage under any one or more of these three prongs of the definition of disability, i.e., paragraphs (g)(1)(i) (the "actual disability" prong),

(g)(1)(ii) (the "record of" prong), and/or (g)(1)(iii) (the "regarded as" prong) of this section.

(3) Where an individual is not challenging a covered entity's failure to make reasonable accommodations and does not require a reasonable accommodation, it is generally unnecessary to proceed under the "actual disability" or "record of" prongs, which require a showing of an impairment that substantially limits a major life activity or a record of such an impairment. In these cases, the evaluation of coverage can be made solely under the "regarded as" prong of the definition of disability, which does not require a showing of an impairment that substantially limits a major life activity or a record of such an impairment. An individual may choose, however, to proceed under the "actual disability" and/or "record of" prong regardless of whether the individual is challenging a covered entity's failure to make reasonable accommodations or requires a reasonable accommodation.

Note to paragraph (g): See § 1630.3 for exceptions to this definition.

(h) Physical or mental impairment means--

(1) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine; or

(2) Any mental or psychological disorder, such as an intellectual disability (formerly termed "mental retardation"), organic brain syndrome, emotional or mental illness, and specific learning disabilities.

(i) Major life activities --(1) In general. Major life activities include, but are not limited to:

(i) Caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working; and

(ii) The operation of a major bodily function, including functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions. The operation of a major bodily function includes the operation of an individual organ within a body system.

(2) In determining other examples of major life activities, the term "major" shall not be interpreted strictly to create a demanding standard for disability. ADAAA Section 2(b)(4) (Findings and Purposes). Whether an activity is a "major life activity" is not determined by reference to whether it is of "central importance to daily life."

(j) Substantially limits --

(1) Rules of construction. The following rules of construction apply when determining whether an impairment substantially limits an individual in a major life activity:

(i) The term "substantially limits" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. "Substantially limits" is not meant to be a demanding standard.

(ii) An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to

29 CFR 1630.2

most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

**(iii)** The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis.

**(iv)** The determination of whether an impairment substantially limits a major life activity requires an individualized assessment. However, in making this assessment, the term "substantially limits" shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for "substantially limits" applied prior to the ADAAA.

**(v)** The comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical analysis. Nothing in this paragraph is intended, however, to prohibit the presentation of scientific, medical, or statistical evidence to make such a comparison where appropriate.

**(vi)** The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures. However, the ameliorative effects of ordinary eyeglasses or contact lenses shall be considered in determining whether an impairment substantially limits a major life activity.

**(vii)** An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

**(viii)** An impairment that substantially limits one major life activity need not substantially limit other major life activities in order to be considered a substantially limiting impairment.

**(ix)** The six-month "transitory" part of the "transitory and minor" exception to "regarded as" coverage in § 1630.15(f) does not apply to the definition of "disability" under paragraphs (g)(1)(i) (the "actual disability" prong) or (g)(1)(ii) (the "record of" prong) of this section. The effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of this section.

**(2)** Non-applicability to the "regarded as" prong. Whether an individual's impairment "substantially limits" a major life activity is not relevant to coverage under paragraph (g)(1)(iii) (the "regarded as" prong) of this section.

**(3)** Predictable assessments --(i) The principles set forth in paragraphs (j)(1)(i) through (ix) of this section are intended to provide for more generous coverage and application of the ADA's prohibition on discrimination through a framework that is predictable, consistent, and workable for all individuals and entities with rights and responsibilities under the ADA as amended.

**(ii)** Applying the principles set forth in paragraphs (j)(1)(i) through (ix) of this section, the individualized assessment of some types of impairments will, in virtually

29 CFR 1630.2

all cases, result in a determination of coverage under paragraphs (g)(1)(i) (the "actual disability" prong) or (g)(1)(ii) (the "record of" prong) of this section. Given their inherent nature, these types of impairments will, as a factual matter, virtually always be found to impose a substantial limitation on a major life activity. Therefore, with respect to these types of impairments, the necessary individualized assessment should be particularly simple and straightforward.

**(iii)** For example, applying the principles set forth in paragraphs (j)(1)(i) through (ix) of this section, it should easily be concluded that the following types of impairments will, at a minimum, substantially limit the major life activities indicated: Deafness substantially limits hearing; blindness substantially limits seeing; an intellectual disability (formerly termed mental retardation) substantially limits brain function; partially or completely missing limbs or mobility impairments requiring the use of a wheelchair substantially limit musculoskeletal function; autism substantially limits brain function; cancer substantially limits normal cell growth; cerebral palsy substantially limits brain function; diabetes substantially limits endocrine function; epilepsy substantially limits neurological function; Human Immunodeficiency Virus (HIV) infection substantially limits immune function; multiple sclerosis substantially limits neurological function; muscular dystrophy substantially limits neurological function; and major depressive disorder, bipolar disorder, post-traumatic stress disorder, obsessive compulsive disorder, and schizophrenia substantially limit brain function. The types of impairments described in this section may substantially limit additional major life activities not explicitly listed above.

**(4)** Condition, manner, or duration --

   **(i)** At all times taking into account the principles in paragraphs (j)(1)(i) through (ix) of this section, in determining whether an individual is substantially limited in a major life activity, it may be useful in appropriate cases to consider, as compared to most people in the general population, the condition under which the individual performs the major life activity; the manner in which the individual performs the major life activity; and/or the duration of time it takes the individual to perform the major life activity, or for which the individual can perform the major life activity.

   **(ii)** Consideration of facts such as condition, manner, or duration may include, among other things, consideration of the difficulty, effort, or time required to perform a major life activity; pain experienced when performing a major life activity; the length of time a major life activity can be performed; and/or the way an impairment affects the operation of a major bodily function. In addition, the non-ameliorative effects of mitigating measures, such as negative side effects of medication or burdens associated with following a particular treatment regimen, may be considered when determining whether an individual's impairment substantially limits a major life activity.

   **(iii)** In determining whether an individual has a disability under the "actual disability" or "record of" prongs of the definition of disability, the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve. For example, someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in the major life activity of learning because of the additional time or effort he or she must spend to read, write, or learn compared to most people in the general population.

29 CFR 1630.2

(iv) Given the rules of construction set forth in paragraphs (j)(1)(i) through (ix) of this section, it may often be unnecessary to conduct an analysis involving most or all of these types of facts. This is particularly true with respect to impairments such as those described in paragraph (j)(3)(iii) of this section, which by their inherent nature should be easily found to impose a substantial limitation on a major life activity, and for which the individualized assessment should be particularly simple and straightforward.

(5) Examples of mitigating measures --Mitigating measures include, but are not limited to:

(i) Medication, medical supplies, equipment, or appliances, low-vision devices (defined as devices that magnify, enhance, or otherwise augment a visual image, but not including ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aid(s) and cochlear implant(s) or other implantable hearing devices, mobility devices, and oxygen therapy equipment and supplies;

(ii) Use of assistive technology;

(iii) Reasonable accommodations or "auxiliary aids or services" (as defined by _42 U.S.C. 12103_(1));

(iv) Learned behavioral or adaptive neurological modifications; or

(v) Psychotherapy, behavioral therapy, or physical therapy.

(6) Ordinary eyeglasses or contact lenses -- defined. Ordinary eyeglasses or contact lenses are lenses that are intended to fully correct visual acuity or to eliminate refractive error.

(k) Has a record of such an impairment --

(1) In general. An individual has a record of a disability if the individual has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.

(2) Broad construction. Whether an individual has a record of an impairment that substantially limited a major life activity shall be construed broadly to the maximum extent permitted by the ADA and should not demand extensive analysis. An individual will be considered to have a record of a disability if the individual has a history of an impairment that substantially limited one or more major life activities when compared to most people in the general population, or was misclassified as having had such an impairment. In determining whether an impairment substantially limited a major life activity, the principles articulated in paragraph (j) of this section apply.

(3) Reasonable accommodation. An individual with a record of a substantially limiting impairment may be entitled, absent undue hardship, to a reasonable accommodation if needed and related to the past disability. For example, an employee with an impairment that previously limited, but no longer substantially limits, a major life activity may need leave or a schedule change to permit him or her to attend follow-up or "monitoring" appointments with a health care provider.

(l) " Is regarded as having such an impairment." The following principles apply under the "regarded as" prong of the definition of disability (paragraph (g)(1)(iii) of this section) above:

29 CFR 1630.2

(1) Except as provided in § 1630.15(f), an individual is "regarded as having such an impairment" if the individual is subjected to a prohibited action because of an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity. Prohibited actions include but are not limited to refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment

(2) Except as provided in § 1630.15(f), an individual is "regarded as having such an impairment" any time a covered entity takes a prohibited action against the individual because of an actual or perceived impairment, even if the entity asserts, or may or does ultimately establish, a defense to such action.

(3) Establishing that an individual is "regarded as having such an impairment" does not, by itself, establish liability. Liability is established under title I of the ADA only when an individual proves that a covered entity discriminated on the basis of disability within the meaning of section 102 of the ADA, *42 U.S.C. 12112.*

(m)   The term " qualified," with respect to an individual with a disability, means that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position. See § 1630.3 for exceptions to this definition.

(n)   **Essential functions --**

(1)   In general. The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires. The term "essential functions" does not include the marginal functions of the position.

(2)   A job function may be considered essential for any of several reasons, including but not limited to the following:

(i)   The function may be essential because the reason the position exists is to perform that function;

(ii)   The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or

(iii)   The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

(3)   Evidence of whether a particular function is essential includes, but is not limited to:

(i)   The employer's judgment as to which functions are essential;

(ii)   Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii)   The amount of time spent on the job performing the function;

(iv)   The consequences of not requiring the incumbent to perform the function;

(v)   The terms of a collective bargaining agreement;

(vi)   The work experience of past incumbents in the job; and/or

(vii)   The current work experience of incumbents in similar jobs.

29 CFR 1630.2

(o)  Reasonable accommodation. (1) The term reasonable accommodation means:

   (i)  Modifications or adjustments to a job application process that enable a qualified applicant with a disability to be considered for the position such qualified applicant desires; or

   (ii)  Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position; or

   (iii)  Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

      (2)  Reasonable accommodation may include but is not limited to:

         (i)  Making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

         (ii)  Job restructuring; part-time or modified work schedules; reassignment to a vacant position; acquisition or modifications of equipment or devices; appropriate adjustment or modifications of examinations, training materials, or policies; the provision of qualified readers or interpreters; and other similar accommodations for individuals with disabilities.

      (3)  To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

      (4)  A covered entity is required, absent undue hardship, to provide a reasonable accommodation to an otherwise qualified individual who meets the definition of disability under the "actual disability" prong (paragraph (g)(1)(i) of this section), or "record of" prong (paragraph (g)(1)(ii) of this section), but is not required to provide a reasonable accommodation to an individual who meets the definition of disability solely under the "regarded as" prong (paragraph (g)(1)(iii) of this section).

(p)  **Undue hardship --**

   (1)  In general. Undue hardship means, with respect to the provision of an accommodation, significant difficulty or expense incurred by a covered entity, when considered in light of the factors set forth in paragraph (p)(2) of this section.

   (2)  Factors to be considered. In determining whether an accommodation would impose an undue hardship on a covered entity, factors to be considered include:

      (i)  The nature and net cost of the accommodation needed under this part, taking into consideration the availability of tax credits and deductions, and/or outside funding;

      (ii)  The overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation, the number of persons employed at such facility, and the effect on expenses and resources;

29 CFR 1630.2

    (iii) The overall financial resources of the covered entity, the overall size of the business of the covered entity with respect to the number of its employees, and the number, type and location of its facilities;

    (iv) The type of operation or operations of the covered entity, including the composition, structure and functions of the workforce of such entity, and the geographic separateness and administrative or fiscal relationship of the facility or facilities in question to the covered entity; and

    (v) The impact of the accommodation upon the operation of the facility, including the impact on the ability of other employees to perform their duties and the impact on the facility's ability to conduct business.

(q) Qualification standards means the personal and professional attributes including the skill, experience, education, physical, medical, safety and other requirements established by a covered entity as requirements which an individual must meet in order to be eligible for the position held or desired.

(r) Direct Threat means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation. The determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include:

    (1) The duration of the risk;

    (2) The nature and severity of the potential harm;

    (3) The likelihood that the potential harm will occur; and

    (4) The imminence of the potential harm.

---

**Statutory Authority**

## AUTHORITY NOTE APPLICABLE TO ENTIRE PART:

*42 U.S.C. 12116 and 12205a of the Americans with Disabilities Act, as amended.*

---

**History**

[56 FR 35734, July 26, 1991; *76 FR 16978, 17000,* Mar. 25, 2011]

*LEXISNEXIS' CODE OF FEDERAL REGULATIONS*
*Copyright © 2014, by Matthew Bender & Company, a member of the LexisNexis Group. All rights reserved.*

## 29 CFR PART 1630 APPENDIX

This section is current through the January 30, 2014 issue of the Federal Register

**Code of Federal Regulations** > **TITLE 29--** > **SUBTITLE B--** > **CHAPTER XIV--** > **PART 1630--**

---

**APPENDIX TO PART 1630 -- INTERPRETIVE GUIDANCE ON TITLE I OF THE AMERICANS WITH DISABILITIES ACT**

---

Introduction

The Americans with Disabilities Act (ADA) is a landmark piece of civil rights legislation signed into law on July 26, 1990, and amended effective January 1, 2009. See *42 U.S.C. 12101* et seq., as amended. In passing the ADA, Congress recognized that "discrimination against individuals with disabilities continues to be a serious and pervasive social problem" and that the "continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity." *42 U.S.C. 12101*(a)(2), (8). Discrimination on the basis of disability persists in critical areas such as housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, access to public services, and employment. *42 U.S.C. 12101*(a)(3). Accordingly, the ADA prohibits discrimination in a wide range of areas, including employment, public services, and public accommodations.

Title I of the ADA prohibits disability-based discrimination in employment. The Equal Employment Opportunity Commission (the Commission or the EEOC) is responsible for enforcement of title I (and parts of title V) of the ADA. Pursuant to the ADA as amended, the EEOC is expressly granted the authority and is expected to amend these regulations. *42 U.S.C. 12205a.* Under title I of the ADA, covered entities may not discriminate against qualified individuals on the basis of disability in regard to job application procedures, the hiring, advancement or discharge of employees, employee compensation, job training, or other terms, conditions, and privileges of employment. *42 U.S.C. 12112*(a). For these purposes, "discriminate" includes (1) limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of the applicant or employee; (2) participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicants or employees to discrimination; (3) utilizing standards, criteria, or other methods of administration that have the effect of discrimination on the basis of disability; (4) not making reasonable accommodation to the known physical or mental limitations of an otherwise qualified individual with a disability, unless the covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the covered entity; (5) denying employment opportunities to a job applicant or employee who is otherwise qualified, if such denial is based on the need to make reasonable accommodation; (6) using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criterion is shown to be job related for the position in question and is consistent with business necessity; and (7) subjecting applicants or employees to prohibited medical inquiries or examinations. See *42 U.S.C. 12112*(b), (d).

As with other civil rights laws, individuals seeking protection under these anti-discrimination provisions of the ADA generally must allege and prove that they are members of the "protected class." n1 Under the ADA, this typically means they have to show that they meet the statutory

29 CFR PART 1630 APPENDIX

Sensenbrenner Statement at 4. An individual may choose, however, to proceed under the "actual disability" and/or "record of" prong regardless of whether the individual is challenging a covered entity's failure to make reasonable accommodation or requires a reasonable accommodation.

To fully understand the meaning of the term "disability," it is also necessary to understand what is meant by the terms "physical or mental impairment," "major life activity," "substantially limits," "record of," and "regarded as." Each of these terms is discussed below.

Section 1630.2(h) Physical or Mental Impairment

Neither the original ADA nor the ADAAA provides a definition for the terms "physical or mental impairment." However, the legislative history of the Amendments Act notes that Congress "expect[s] that the current regulatory definition of these terms, as promulgated by agencies such as the U.S. Equal Employment Opportunity Commission (EEOC), the Department of Justice (DOJ) and the Department of Education Office of Civil Rights (DOE OCR) will not change." 2008 Senate Statement of Managers at 6. The definition of "physical or mental impairment" in the EEOC's regulations remains based on the definition of the term "physical or mental impairment" found in the regulations implementing section 504 of the Rehabilitation Act at 34 CFR part 104. However, the definition in EEOC's regulations adds additional body systems to those provided in the section 504 regulations and makes clear that the list is non-exhaustive.

It is important to distinguish between conditions that are impairments and physical, psychological, environmental, cultural, and economic characteristics that are not impairments. The definition of the term "impairment" does not include physical characteristics such as eye color, hair color, left-handedness, or height, weight, or muscle tone that are within "normal" range and are not the result of a physiological disorder. The definition, likewise, does not include characteristic predisposition to illness or disease. Other conditions, such as pregnancy, that are not the result of a physiological disorder are also not impairments. However, a pregnancy-related impairment that substantially limits a major life activity is a disability under the first prong of the definition. Alternatively, a pregnancy-related impairment may constitute a "record of" a substantially limiting impairment," or may be covered under the "regarded as" prong if it is the basis for a prohibited employment action and is not "transitory and minor."

The definition of an impairment also does not include common personality traits such as poor judgment or a quick temper where these are not symptoms of a mental or psychological disorder. Environmental, cultural, or economic disadvantages such as poverty, lack of education, or a prison record are not impairments. Advanced age, in and of itself, is also not an impairment. However, various medical conditions commonly associated with age, such as hearing loss, osteoporosis, or arthritis would constitute impairments within the meaning of this part. See 1989 Senate Report at 22-23; 1990 House Labor Report at 51-52; 1990 House Judiciary Report at 28-29.

Section 1630.2(i) Major Life Activities

The ADAAA provided significant new guidance and clarification on the subject of "major life activities." As the legislative history of the Amendments Act explains, Congress anticipated that protection under the ADA would now extend to a wider range of cases, in part as a result of the expansion of the category of major life activities. See 2008 Senate Statement of Managers at 8 n.17.

For purposes of clarity, the Amendments Act provides an illustrative list of major life activities, including caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping,

29 CFR PART 1630 APPENDIX

walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, think-ing, communicating, and working. The ADA Amendments expressly made this statutory list of examples of major life activities non-exhaustive, and the regulations include sitting, reach-ing, and interacting with others as additional examples. Many of these major life activities listed in the ADA Amendments Act and the regulations already had been included in the EEOC's 1991 now-superseded regulations implementing title I of the ADA and in sub-regulatory docu-ments, and already were recognized by the courts.

The ADA as amended also explicitly defines "major life activities" to include the operation of "major bodily functions." This was an important addition to the statute. This clarification was needed to ensure that the impact of an impairment on the operation of a major bodily func-tion would not be overlooked or wrongly dismissed as falling outside the definition of "ma-jor life activities" under the ADA. 2008 House Judiciary Committee Report at 16; see also 2008 Senate Statement of Managers at 8 ("for the first time [in the ADAAA], the category of ma-jor life activities' is defined to include the operation of major bodily functions, thus better ad-dressing chronic impairments that can be substantially limiting").

The regulations include all of those major bodily functions identified in the ADA Amendments Act's non-exhaustive list of examples and add a number of others that are consistent with the body systems listed in the regulations' definition of "impairment" (at § 1630.2(h)) and with the U.S. Department of Labor's nondiscrimination and equal employment opportunity regulations implementing section 188 of the Workforce Investment Act of 1998, *29 U.S.C. 2801*, et seq. Thus, special sense organs, skin, genitourinary, cardiovascular, hemic, lymphatic, and musculoskel-etal functions are major bodily functions not included in the statutory list of examples but in-cluded in § 1630.2(i)(1)(ii). The Commission has added these examples to further illustrate the non-exhaustive list of major life activities, including major bodily functions, and to empha-size that the concept of major life activities is to be interpreted broadly consistent with the Amendments Act. The regulations also provide that the operation of a major bodily function may include the operation of an individual organ within a body system. This would include, for example, the operation of the kidney, liver, pancreas, or other organs.

The link between particular impairments and various major bodily functions should not be dif-ficult to identify. Because impairments, by definition, affect the functioning of body systems, they will generally affect major bodily functions. For example, cancer affects an individual's nor-mal cell growth; diabetes affects the operation of the pancreas and also the function of the en-docrine system; and Human Immunodeficiency Virus (HIV) infection affects the immune sys-tem. Likewise, sickle cell disease affects the functions of the hemic system, lymphedema affects lymphatic functions, and rheumatoid arthritis affects musculoskeletal functions.

In the legislative history of the ADAAA, Congress expressed its expectation that the statutory ex-pansion of "major life activities" to include major bodily functions (along with other statu-tory changes) would lead to more expansive coverage. See 2008 Senate Statement of Manag-ers at 8 n.17 (indicating that these changes will make it easier for individuals to show that they are eligible for the ADA's protections under the first prong of the definition of disability). The House Education and Labor Committee explained that the inclusion of major bodily func-tions would "affect cases such as U.S. v. Happy Time Day Care Ctr. in which the courts struggled to analyze whether the impact of HIV infection substantially limits various major life activities of a five-year-old child, and recognizing, among other things, that there is some-thing inherently illogical about inquiring whether' a five-year-old's ability to procreate is sub-stantially limited by his HIV infection; Furnish v. SVI Sys., Inc, in which the court found that an individual with cirrhosis of the liver caused by Hepatitis B is not disabled because liver function --unlike eating, working, or reproducing-- is not integral to one's daily existence;' and Pimen-

29 CFR PART 1630 APPENDIX

tal v. Dartmouth-Hitchcock Clinic, in which the court concluded that the plaintiff's stage three breast cancer did not substantially limit her ability to care for herself, sleep, or concentrate. The Committee expects that the plaintiffs in each of these cases could establish a [substantial limitation] on major bodily functions that would qualify them for protection under the ADA." 2008 House Education and Labor Committee Report at 12.

The examples of major life activities (including major bodily functions) in the ADAAA and the EEOC's regulations are illustrative and non-exhaustive, and the absence of a particular life activity or bodily function from the examples does not create a negative implication as to whether an omitted activity or function constitutes a major life activity under the statute. See 2008 Senate Statement of Managers at 8; See also 2008 House Committee on Educ. and Labor Report at 11; 2008 House Judiciary Committee Report at 17.

The Commission anticipates that courts will recognize other major life activities, consistent with the ADA Amendments Act's mandate to construe the definition of disability broadly. As a result of the ADA Amendments Act's rejection of the holding in _Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184 (2002),_ whether an activity is a "major life activity" is not determined by reference to whether it is of "central importance to daily life." See Toyota, 534 U.S. at 197 (defining "major life activities" as activities that are of "central importance to most people's daily lives"). Indeed, this holding was at odds with the earlier Supreme Court decision of _Bragdon v. Abbott, 524 U.S. 624 (1998),_ which held that a major life activity (in that case, reproduction) does not have to have a "public, economic or daily aspect." _Id. at 639._

Accordingly, the regulations provide that in determining other examples of major life activities, the term "major" shall not be interpreted strictly to create a demanding standard for disability. Cf. 2008 Senate Statement of Managers at 7 (indicating that a person is considered an individual with a disability for purposes of the first prong when one or more of the individual's "important life activities" are restricted) (citing 1989 Senate Report at 23). The regulations also reject the notion that to be substantially limited in performing a major life activity, an individual must have an impairment that prevents or severely restricts the individual from doing "activities that are of central importance to most people's daily lives." Id.; see also 2008 Senate Statement of Managers at 5 n.12.

Thus, for example, lifting is a major life activity regardless of whether an individual who claims to be substantially limited in lifting actually performs activities of central importance to daily life that require lifting. Similarly, the Commission anticipates that the major life activity of performing manual tasks (which was at issue in Toyota) could have many different manifestations, such as performing tasks involving fine motor coordination, or performing tasks involving grasping, hand strength, or pressure. Such tasks need not constitute activities of central importance to most people's daily lives, nor must an individual show that he or she is substantially limited in performing all manual tasks.

Section 1630.2(j) Substantially Limits

In any case involving coverage solely under the "regarded as" prong of the definition of "disability" (e.g., cases where reasonable accommodation is not at issue), it is not necessary to determine whether an individual is "substantially limited" in any major life activity. See 2008 Senate Statement of Managers at 10; id. at 13 ("The functional limitation imposed by an impairment is irrelevant to the third regarded as' prong."). Indeed, Congress anticipated that the first and second prongs of the definition of disability would "be used only by people who are affirmatively seeking reasonable accommodations * * * " and that "[a]ny individual who has been discriminated against because of an impairment--short of being granted a reasonable